OK, when you're ready. Thank you. Good morning, Your Honors. My name is Allison Barry Wilkinson, and I represent Defendant Apelli Scott Thorne. Mr. Marshall Bluestone represents Deputy Bo Zastrow. We have agreed to split our time evenly. I will reserve two and a half minutes of my 7.5 minute allotment for rebuttal. So I will use five minutes now.  Thank you very much. It's on you to do your best to keep track. I will, Your Honor. Thank you. As the Court will recall, Deputy Thorne contends there was no clearly established law as of September 24, 2016, or even thereafter, that would have led a reasonable deputy to conclude that a taser could not be used on a subject who refused to cooperate with deputies after hearing profanity-laced screaming coming from the residence that they had responded to after a neighbor placed a 911 call. But the report is that the profanity was coming not from him, but from the wife. Understood, but the profanity and the screaming was coming from inside the house, which suggests a domestic disturbance in progress going on. But the report suggests that if the word is aggressor, the aggressor is maybe uncharacteristically, but the aggressor is the wife. They get there. He's in the bedroom behind a locked door. They get in there. He's lying on his back. I mean, we've all looked at the video. And they say, get up. And he's saying, I'm calling my lawyer. And he doesn't get up. And he then gets tased, and then he gets whacked with a baton on his knees. I mean, that's what I saw in the video. Yes, certainly, Your Honor. That is a summary of what transpired. The baton strike is not at issue on the qualified immunity claim, just simply the taser, which was the first use of force that was more than a minimal use of force. And it was in dart mode as well. It was in dart mode, yes, when it was. Even though if you're tasing someone and you have contact, there's no need for dart. I mean, the dart is like a little harpoon. And if you're trying to tase to get the shock, and if you're right next to him, you don't need the dart. That is correct. But you would have to lean in in order to be able to use the dart or the taser in the alternative mode. What we have here in this particular case is a question of whether or not there was clearly established law that the conduct of Mr. Del Valle prior to the taser discharge constituted passive versus active resistance. And Mr. Del Valle's conduct, it is clearly established and undisputed prior to the dart being discharged from Deputy Thorne's taser, included four efforts in which he resisted, twisted, and pulled away from Deputy Thorne's use of minor force in order to gain compliance with his commands to Mr. Del Valle to get off the bed. And then on the fifth effort to gain compliance, Mr. Del Valle changed the game considerably by reaching out, grabbing Deputy Thorne's arm, and pushing it away, only after which, and it's undisputed both from the plaintiff's side as well as the video, that the taser was only discharged at that point in time. There was no way a reasonable deputy would have known as of September 24th of 2016 that this type of twisting and pulling away, that this type of a grab, hold, and push that Mr. Del Valle engaged in in the split second that he had a responsibility to make a decision about what was occurring, and the close proximity that they were on a very volatile domestic violence call constituted passive versus active resistance. I mean, why was it so volatile, though? He's lying in bed looking at a cell phone in a room that was locked, so they weren't in the same place. Why is this such a dangerous situation? It was dangerous at the point in time in which Mr. Del Valle is refusing to comply with the orders, as the evidence shows the deputies were concerned that they- Well, why were they trying to, I mean, were they trying to arrest him? What were they trying to do? They were trying to contain the scene, make sure that it was safe, and interview the involved parties for the purposes of determining whether or not the domestic dispute had erupted into any form of violence. There was, prior to the entry, the odd behavior of the 90-second delay, the stopping of the screening, the turning off of the lights upon the entry to the house. There was also scenes of, or signs of violence as the deputies entered the home, where they could see the overturned couch in the disrupted room. They had an individual who was, yes, locked behind the door, who could either be a suspect of domestic violence or a victim that they needed to attend to, and they were conducting their welfare checks. So their first priority was to render safe the scene. You know, I looked at that video. It did not look to me as though Officer Thorne thought he was dealing with a victim. I understand your perspective, and one could make that assessment if one chose to, but the issue really comes down to when Mr. Del Valle chose to escalate his resistance from just simply non-cooperation and verbal to twisting and pulling away, to affirmatively grasping Deputy Thorne's arm and pushing it away, in that close proximity is that active resistance. What transpired beforehand, in terms of the tactics, the procedures, the assessments that were made, one can draw inferences, as Your Honor obviously has, about what they believe Deputy Thorne thought at the time. Nonetheless, at the moment that Mr. Del Valle grabbed Deputy Thorne, he committed a battery in close proximity in a dangerous environment where the evidence shows that the deputies were trained, the case law establishes that domestic dispute calls can erupt into violence unexpectedly, and in addition, we have a circumstance where the deputy was now having probable cause with a taser in his hand and needed to extract himself from that circumstance. So what was the goal in asking him to stand up? What was that going to accomplish? And frankly, I also think your characterization of him twisting and pulling away is fairly generous. Understood, Your Honor. To your side. And I can certainly say that that is what the appearance was from the video, and one can certainly draw a different inference from that. But the goal at the time was to render the scene safe. As you saw from Deputy Zastrow's declaration, which is in the record, there was a concern that a bed is a common location for a weapon to be hidden, and the reluctance of Mr. But his hands are visible. I mean, I just don't understand these arguments. It doesn't seem, when you look at the video, like any of these things were happening. I mean, you see his hands, so he's not reaching for a weapon. He's looking at a cell phone. He's visible. He doesn't seem to be injured. He's talking to them, and he was in a locked room, so the people who maybe were committing some sort of crime together are not together. It's just, it seems like the officers are the ones  Well, the issue is not whether the officers created the danger from which this event then evolved. The question is whether or not, upon the grab by Mr. Del Valle, intermediate force could be used, because we no longer, of course, have that provocation rule under Mendez. We have to look at each of the elements of the event in sequence. And with that in mind, then, we have a circumstance where the deputy is grabbed. The deputy has very limited choices at that point in time in how to respond, and in essence, chose to discharge the taser. The issue at hand is active versus passive resistance. You've just come to the end of your time, and it's mostly our fault that that's so. I want to ask you a question that won't take away from the rebuttal time that you have sought to reserve. Thank you, Your Honor. And in a way, it's off to one side, and you may or may not know the answer. What did the county know about Officer Thorne's history in Los Angeles and in Richmond before they hired him? That certainly is a question off to the side, but the county did a background investigation of Mr. Thorne prior to his hire, and had examined the records from the city of Richmond as well as the county of Los Angeles. So the county knew that he had two, three excessive force incidents while working for Richmond, and that's why they fired him? The county knew that and hired him anyway? The county knew that he had events in his past background. The precise nature of those events, I would defer to Mr. Bluestone, who represented the county, as to what they specifically did or did not know. But the reason for his discharge from the county of Sonoma was his release from probation after this event, not what occurred in any prior jurisdictions. No, no, but I was trying to figure out what in the world the county was thinking of when they hired this guy in the first place. And certainly that was an issue which the lower court granted summary judgment to the county on in terms of a negligent hiring claim. Right. And I will allow the county to address that. Oh, okay, and the county's not now before us until I realize that, okay. Yes, understood. Mr. Bluestone represents both the county of Sonoma as well as Deputies Astro. Okay, thank you. Thank you, Your Honor. And that little bit's not on you, that was my time. Okay. Thank you, Your Honor. Good morning, my name is Marshall Bluestone representing Deputies Bo Zastrow on his appeal from the qualified immunity. In this case, Deputies Astro has been held liable not for his own unconstitutional acts, but his under the court's analysis, the district court's analysis to whether Deputy Zastrow's integral participation in this event ties him to the claimed excessive force by Deputy Thorne. So we have to examine, and what the court didn't do below is examine the Boyd v. Benton County elements, which defines what's fundamental involvement in the actions that took place. And the Boyd v. Benton County case came up with three elements to show whether or not an officer was fundamentally involved. And they were that the officer knew in advance of an unconstitutional plan that they did not object to this unconstitutional plan. And thereafter, with that knowledge, continue to participate it. And in this way, you can say, even though they didn't commit the excessive force or the unlawful conduct, that by knowing about it in advance, not objecting, that they then willingly participated in it, that their own conduct is subject to liability for their own conflict. Now, on the facts here, I gather what's at issue is the action of your client or actions of your client, basically in holding down the legs of Mr. Del Valle, after he's off the bed. And after he's off the bed, we're over by the door, and we're getting, he's on the ground, there's a brief period of a choke hold, and then there are a couple of blows from a baton, during which it looks as though your client is holding his legs down. Is that right? Well, first of all, there's- Is that right on the facts? I mean, that's how I remember the video. The video is that he was attempting to control him while Mr. Del Valle was resisting during the brief attempt for choke hold, and when Mr. Del Valle rose to the level, and Deputy Thorne used the baton at this point, he's attempting to control him. There's also one period before that, when he first comes up to the bed, after the taser, after the plaintiff grabs Deputy Thorne, and there's probable cause to arrest at that point, he goes up to the bed, puts his hands on him, and no weapons drawn, in a calm manner, with the other deputy deem, and tells him he's being taken into custody, puts his hands on him for, I think, less than five seconds, and he bolts from the bed towards the door, and Deputy Thorne uses a baton to bring him to the ground at that point. As to the part that Judge Fletcher asked about, so when your client was holding the legs, and Officer Thorne is doing a choke hold, if your client is holding the legs, and sees the choke hold, and is holding while the choke hold is happening, isn't he helping with the action of the choke hold, because he's keeping the guy from moving? That's the third element of the Boyd test. The third element is, do you continue to participate when you have advanced knowledge of a plan, to use unconstitutional plan, and fail to object to it? There's no duty to intervene in this case. That's not part of it, part of this case. It's not planned. But it doesn't seem like advanced notice makes a lot of sense as an element, if you can see the thing happening, and are helping do it. Then you're part of it, right? So why isn't holding the legs part of the choke hold? Well, why isn't it part of the choke hold? I mean, why isn't it part of the actions that facilitate the choke hold, that you're holding the legs, so he can't squirm away from the choke hold? Well, you're assuming that there's anything in the record that shows that my client knew what was going on with the choke hold, when that was happening. He's already seen Officer Thorne tase him on the bed, and whack him with a baton across his knees multiple times. He's already seen Officer Thorne bring him to the ground by hitting him with a baton on the back as he's getting to the door. So it's not as though he's thinking Officer Thorne is the most sort of, the most pacifist person in the world. He might be able to suspect that if he holds down Mr. Del Valle, Mr. Thorne might do something else. So you have- Similar to what he's already done. So you have an officer who has someone that has committed a crime, and he's taking that person into custody. Another officer that they see, assuming your fact pattern, using an excessive force- It's what I saw on the video. I'm not assuming anything. Well, you're, there was no anticipation for my client to know that when he's going to take a lawful arrest, and take someone into custody, and he's trying to hold the legs, and he's not in control at that point, and he's resisting at that point, that he knows that in advance that he's going to use a baton. You're asking- Well, he's seen him use it already while the guy's on the bed. He's seen him use it already when he's getting to the door, and no surprise, he did it again. So under the scenario, officers take, officers in making a lawful arrest put their hands to take someone in control for making a lawful arrest and take him to custody. If that's a predicate for any spontaneous action that happens by another officer, where's the line drawn? How is my client going to know that if, in this case, that if I go and put my hands on someone to make a lawful arrest, that if any spontaneous actions happen by an officer after that point, I'm personally liable. Lawful- I mean, that sounds like an excellent closing, which means that it's a factual question about whether your client was an integral part of the scrum. Well, I don't think there's clearly stated case law that would meet that element. If you look even at the case of Blake- And thank you for, because help me out on that. So does the status of the case law on whether he was an integral part, is that what we look at, or are we looking at the case law on the underlying act itself? I think you have to look at the case law on integral participation, because that's what he's being held on. And at that point, it's not clearly established. The one case that you can look at is Blankenhorn. In Blankenhorn, there were a officer that came to the scene in the middle of the struggle, and the other officers had tackled the individual, they had punched the individual, and in the middle of the struggle, the officer, Keano, came to the middle of it, grabbed the person's arm, and started to handcuff him, and finally handcuffed him. The Ninth Circuit in Blankenhorn found that that officer was not an integral participant in the gang tackling or the punching, even though he was involved with that. Those are spontaneous actions that happen on split-second decisions that are happening in chaotic situations. But the Ninth Circuit did find that after the plaintiff in that case was handcuffed, prone on the ground, in a static position, and not resisting, that they put hobble restraints on him. And on that point, the officer who actually put the handcuff was controlling him in order for, and he could see, the hobble restraints are being ordered to be put on him, they're taken out of the car, wherever they came from, they're systematically put on him. He's got a chance to reflect on what's happening. You were starting to say earlier that you don't think your client could see the choke hold. Can you explain what the basis for saying that is? Well, he's on the ground, on his knees, trying to control in a struggling situation, and Deputy Thorn is straddled across his back. If he looks this way, there's Deputy Thorn there. There's no way he can see in front of where the head is, that he can't see that happening. And the spontaneous activity of when the plaintiff starts to rise up off the ground, Deputy Thorn, hits him twice with a baton at that point, in reaction to that, he can't anticipate anything that that's happening. And so in the Blankenhorn case, they found liability because in a static, controlled environment where there's absolutely no resistance going on, he had time to reflect on whether the hobble restraints should be placed or not. Okay, now we've taken you over time. I expect you'd like a little time for rebuttal. And I'm going to ask you, again, this is on my time, not yours. What did the county know, to the extent you can tell me, about Mr. Thorn's record when they hired him? And I understand the county's not out of this. I mean, I get this. I understand. It's a side issue. And let me tell you, the investigation was about this thick. And they sent individuals down to every single law enforcement agency to interview the actual people that were involved. This was before he was hired? Before he was hired, the decision. And they asked people, they sent people down to every employer that was in law enforcement they had and actually interviewed the people, looked at the actual complaints that were laid against him. And it's very detailed in what they found out, and it's very detailed. There were, and the officers that were involved in both places that he was at before were interviewed and explained the circumstances of what happened. They went down to Los Angeles County where he was in corrections at the time and explained exactly what happened. And they made a decision based upon, not only did it happen 12 years or 15 years, 12 years or 15 years earlier, but that he had, during that period of time, they felt that he had matured and grown. He was going to Hastings Law School at the time and be a law student. He, by pulling down some time at the Sacramento District Attorney's Office and working at their office, I mean, it's a period of time that it happened. And they did a thorough investigation. That's Los Angeles, what about Richmond? Richmond, they sent people down there. That was before Los Angeles. That was before Los Angeles. Before Los Angeles, they sent people down there to interview the supervisors that were still there. And they talked to other officers that were there that had transferred to other departments. It was a thorough, they went through a psychological background with a psychologist. Okay, I get it. So they spent a lot of time and turns out made a mistake. Well, they did put a lot of time into it. And I think that's why the district court ended up looking at the full panoply. And they got the inner transcript of the person who actually made the decision and explained why they made the decision. I get it. Okay, thank you. May it please the court. My name is Isaac Schweiger. I represent Mr. Fernando Del Valle. In the district court's order, granting in part and denying in part summary judgment on these issues, the first issue that I would like to take up is as Judge White phrased, as of September 24th, 2016, was it clearly established that it would have been unusual, excuse me, unreasonable to use a taser in dart mode and to strike an individual with a baton when that individual may have been the victim of domestic violence, was not otherwise suspected of a violent crime, and who at least passively resisted the officer's commands. Judge White goes on to list several cases describing the nature of the force that was used. In this circuit, the use of a taser is considered a significant intermediate use of force, as is the baton. There are similarities there. He analyzes these five cases and says that there are certainly factual distinctions between each of the cases that the court put in its order and the case at bar. However, he said the similarities are sufficient enough to have put a reasonable officer on notice that his actions were clearly unconstitutional. The hyper-parsing out of the facts of this case does not help Mr. Thorne's position. The idea that Mr. Delvalle multiple times pulled or twisted or fully encircled his wrist or his forearm with his hand and controlled his arm and moved him away is kind of a frame-by-frame view of the video evidence, in this case, viewing every single frame in the light most favorable to the moving party, to Mr. Thorne here. And that's not what the district court was supposed to do when they looked at this case, nor is it what your honors are supposed to do when analyzing the district court's decision. Specifically, we're supposed to look at the facts in the light most favorable to the non-moving party. Was the law clearly established and was there a constitutional violation? The district court, applying the Graham factors, found that there was a constitutional violation, but of course, under Saussure, that's not the end of the inquiry. We have to determine if the law was clearly established so as to put the officers on notice that their actions were unconstitutional. There's some argument as to whether the officers would know that Mr. Delvalle's actions rose to the level, or, excuse me, were passive resistance as opposed to active resistance. But that's really a factual determination. And if this court is applying the law as it should, then the factual determination must be resolved in light of the facts most favorable to my client. And as the district court judge found, this was, in fact, passive resistance. Now, there's a paradigm. I think he said at least passive resistance. I believe your honor is correct. And I believe that that comports with the language that was used in the Thompson case, where this court found that Mr. Thompson's actions were mostly passive. And certainly, that's informative because resistance exists as does force on a paradigm where we have trivial and minor force, or trivial and minor resistance, and we have serious and even deadly force or resistance on the other end. When the videos are viewed holistically, what we see is a very violent event, but it's not violent because of the actions of my client. I am not here to say that he did everything right in the situation, but the violence and the danger, as this court noted, appears to have been brought by the officers, not by my client. When the officers entered the home, and unfortunately, we don't have an unlawful entry claim before the court, but the entry to the home was warrantless and is presumed unreasonable absent an exception to the warrant requirement. The officers lacked consent and were specifically denied consent when Mrs. Del Valle says, you can't come in. They pushed their way into the home, and almost immediately, Deputy Thorne withdrew his firearm. And it's a small note, but it's important to note because this sets the stage for everything that's to come. And he says, who else is here? And she says, my husband, Fernando, where is he? In the bedroom. And they head to the back bedroom. Deputy Thorne with his firearm out. A deputy who was removed from this case and given, at summary judgment, Deputy Deem, stayed in the first portion of the home with Mrs. Del Valle while the other two officers went to the back. And of course, I don't need to rehash all of the facts of the cases. Your honors have seen the videos. But what we have is officers entering the home absent a clear exigency or consent with no warrant. And we have them operating on the information that the female is the primary aggressor. In fact, in the district court's recitation of the facts, we can see things that she seems to have been drinking, that she's yelling and cursing. And my client is accused of no wrongdoing. There is nothing that comes through on dispatch that would alert the officers that my client had committed a crime or presented any threat whatsoever. Did the officers at the time have any knowledge of any prior encounter or Mr. Del Valle's record? There's a little bit before. Did they know this at the time? What they knew was that dispatch had communicated to them from the reporting party that the male half, unquote, had been taken into custody on a previous, or had gone away with the officers on a previous occasion. And they knew that going in? They did. However, they also knew, because there was a but from the dispatch. Dispatch said, but we have no record of that. So the officers knew that the reporting party said the male half had previously been taken away. Dispatch said, but we have no record of that. And in fact, they're, well, it's not before the court, the additional facts that would flesh that out. But that is what they knew going in. Okay. So as the district court correctly stated, we have a potential victim of domestic violence, if anything, who has separated himself from an explosive situation and doesn't want to come out, in his own home, in the privacy of his bedroom, in his bed, in his pajamas. And Deputy Thorn reacts to his refusal to come out by kicking in the door, to which Mr. Del Valle responds, I'm calling my lawyer. Now, of all the multitude of video footage that your honors must have seen over the years on the bench involving excessive force incidents, there's always room for responsibility to be shared between the parties in a case. And again, I'm not stating that Mr. Del Valle was out without any responsibility here. But what we almost never see is someone who can legitimately be called calm and respectful. He was not aggressive, was not threatening. And he said so to the officers. And he called them, sir. Sir, I am not being aggressive. Sir, I'm in my own house. Sir, I've done nothing wrong. I'm calling my lawyer. Now, that very respectful behavior, even if it's not perfect behavior, it is respectful and certainly not aggressive or threatening, is met with weapons drawn. We have the baton, which is released, and it's stand up, or I'm gonna bust your effing knee. And that's when Mr. Del Valle takes his phone and instead of trying to find his lawyer's phone number, goes to record the event. And thank goodness that he did. But the fact that he pulls out his phone to do this is perceived by Mr. Thorne as a threat. And Mr. Thorne tries to take his phone away from him. And we can see that when Mr. Del Valle states, go ahead, tase me, I've got you on video. And that's when the taser is deployed. This is not active resistance. It is not perfectly passive resistance either. It's on a sliding scale. But it is sufficiently passive that the officer was on clear notice that the use of the taser in DART mode, a significant intermediate use of force, was not lawful under these circumstances. And as such, the dispute really does turn on facts. Was this active or passive resistant? The facts viewed in the light most favorable to the plaintiff seem to suggest that it was passive resistance. And as such, qualified issue should be and was denied. As it pertains to the claims of Mr. Zastrow, I believe that Mr. Zastrow has confused some of the principles of integral participation doctrine here and is seeking, among other things, according to his moving papers, qualified immunity because the doctrine of integral participation may not have been clearly established. I think that is what the argument is, that it was not clear that his client, that Mr. Bluestone's client, would have been deemed an integral participant, therefore he should be granted qualified immunity. But as Your Honor's question did bring up, that's not the question that we should be dealing with here. The question is, when viewing these circumstances in the light most favorable to plaintiff, was he an integral participant or was he not? The qualified immunity has nothing to do with that. The qualified immunity to Mr. Zastrow would only attach if the primary tortfeasor was also given the benefit of qualified immunity. In this case- So do you think there's evidence that Officer Zastrow could see the chokehold? I think that a reasonable jury would conclude that he knew that that was going on. The chokehold, what would be the basis for that conclusion? The proximity of the people together, Your Honor. So their argument is he couldn't have seen because there's a body in the way. How would a jury find that argument to be debatable? I don't believe that that is the case, Your Honor. I believe that Mr. Zastrow was engaged in what police commonly refer to as a figure four hold. I didn't hear. A figure four hold. And I believe the district court also- That's the leg hold. Yes, Your Honor, but it's a little bit more complicated than simply holding someone's legs. It is where one officer takes one leg and folds the ankle of that leg into the crook of the other leg and then folds that leg down on top to squeeze it in place, thus forming almost a figure four with the legs. Given the proximity of one officer to the other and the fact that I do not believe that Mr. Zastrow was in a static position where he was just facing the other end of the room, it's hard to imagine a situation where he did not know what was going on. Is there any of the videos that makes it seem like Zastrow is in a position to see the choke hold? Unfortunately, Your Honor, I can't speak to that right now. I can't give you a definitive answer. And if he could not see the choke hold, then is there a way that he would still be liable for the choke hold? Well, specific to the choke hold, I'm not prepared to make that argument, Your Honor. But so you think he would be liable for the baton strikes? You can certainly hear them, Your Honor, even if you couldn't see them. And you could hear my clients screaming in agony as they're being delivered. And there is no reasonable person on earth who would not know what was going on, even without the benefit of seeing it firsthand. Well, it's pretty clear that Zastrow would have seen the two baton strikes. That's gonna be like that. Less clear as to the choke hold. The choke hold was administered with the baton against the throat, is that right? Yes, and that is, as the facts of this case support, even against department policy. It's not even a carotid restraint, as Your Honor. I understand as to Thorne, they're not even appealing that aspect of qualified immunity. Correct, Your Honor. But the sense of whether it might have been visible to Zastrow, it's not just his hands. He used the baton to go against the throat, which might or might not have been more visible. And I believe, as Your Honor correctly stated, it might or might not have. And if that is the case, then this is an issue of fact to be resolved by the jury, not one for this court. Does the court have any specific questions? I have two minutes remaining in time. No, I think you're about to give the two minutes to the other side. I'll tender my balance, Your Honor. Thank you. You've had time to preserve some time. Would you put two minutes and 30 seconds on the clock, please? Thank you, Your Honor. In counsel's argument, he made a factual misstatement, which I would like to correct here on rebuttal with regard to what the deputies knew when they approached the house. They had been dispatched that there was information that the individual, the male half, had been taken away by deputies before. It's not that the sheriff's department had no record, as counsel stated. It just simply indicated that they were showing nothing recent. And you'll find that in the record at page two. And how does that make a difference? It does make a difference, Your Honor, because what was transpiring inside the Del Valle residence was happening behind closed doors. You can hear a female screaming. You can hear her using loud, provocative, vulgar terms. The neighbors could hear it. The deputies could hear it from the street. What nobody could know, because this was occurring behind closed doors inside a residence, was what prompted that screaming. And a deputy can't assume that just because it appears that someone is louder than another in a domestic dispute, that that person is not a victim of some kind of violence or is in the progress of a matter that could erupt into violence, especially when a deputy enters a home for the purposes of conducting a welfare check on all the parties, which is a legitimate exception to the warrant requirement, the exigency there, and sees signs of violence in a side bedroom and then encounters an individual who is laying on a bed, a place police officers are trained, is a common hiding place for weapons. And as explained in the record at page 36 by Deputy Zastrow, the concern about weapons hidden in the bed in close proximity where an individual could reach them quickly is one that heightened the deputy's concerns. We are now having the plaintiff's counsel argue in essence a provocation theory for the reason why Mr. Del Valle grabbed Deputy Thorne's arm. And the grab was a game changer, notwithstanding anything that had happened prior, even if Mr. Del Valle was entirely passive at that point in time. That grab, that battery, that probable cause for arrest in that close proximity stands in great distinction to each of the cases cited by the district court. I thank you. Thank you very much. Del Valle versus Thorne, submitted for decision. Oh, I didn't know that you had asked to serve some. Yes, please. I didn't mean to cut you off without, but I had not heard you ask for a bottle. I apologize. Your Honors. Two minutes, there. If you'd put two minutes and 30 seconds on the clock. Thank you, Your Honor. We've all looked at the video, and I don't know how many times you've looked at it, but we've looked at it several times. Looked at it with three different body camera angles from three different deputies, probably put it in slow motion to break it down at different parts, and before you even watched it, you knew what the outcome was. Deputy Zasrow couldn't rewind the tape, didn't have three body camera angles, didn't have the chance, but other than to see it as it played out in front of him. If you look at the camera and the time the baton strike, I mean, the baton carotid, it was six seconds of an entire chaotic situation when Mr. DiValle went off the bed. And in the case law here, there's not a case law in the Ninth Circuit which shows that these rapidly involving situations that an officer has this time to reflect upon whether another officer is using this constitutional, claimed unconstitutional force. And that's why the Boyd elements are so important because it's his own actions that are the ones that have to be tested to make him liable for someone else's constitutional violation. The case, and the way these spontaneous actions happen is the baton strikes happen from a different officer and not a planned event. And in California, all the time it happens. A lawful arrest is being made, you put hands on someone to make a lawful arrest. It's a common thing that happens. The fact that some other officer spontaneously uses force at that point, does that make that officer liable for everything that happened afterwards? When it's not a static controlled environment like we have in Blankenhorn or in Boyd or in the other series of cases that evolved here. None of these cases are applicable on these spontaneous type law firms. So the law wasn't clearly established as to the facts in this case. And the Supreme Court says that you have to have squarely facts, squarely on point for them to apply and give an officer the understanding that if I go to make a lawful arrest and I put someone's hands on him and another officer starts to make claimed excessive force, I could be liable. Then I have a decision to make at that point. But there's no case law that puts them on notice that way. And I think if you went through the Boyd elements, you'll find there was no plan, there was no intent or no prior knowledge by Deputy Zastrow that there was intent to harm the plaintiff in this case. Thank you. I apologize for seeking to cut you off. Del Valle versus Thorne submitted for decision and that completes our arguments for this morning. Thank you. Thank you, Your Honor. All rise.
judges: W. Fletcher, Friedland, Hillman